**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| |
|---|
| IN RE APPLICATION OF MIHAILS ULMANS FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782 |

Case No. 23-mc-00023

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR
## JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

Applicant Mihails Ulmans respectfully applies for an order of judicial assistance, pursuant to 28 U.S.C. § 1782, appointing Arthur D. Middlemiss, Esq. as a Commissioner of the Court to facilitate the issuance of subpoenas and the gathering of testimony and documentary evidence from correspondent banks with branch offices or corporate offices located in New York City (together, "Respondents"), who "reside in" or are "found in" the Southern District of New York. The information is sought for use in connection with a foreign criminal proceeding pending in the Riga City Court in Riga, Latvia.

## BACKGROUND

On May 24, 2022, Latvian authorities arrested Mr. Ulmans in connection with the May 30, 2018 murder in Riga, Latvia of Martins Bunkus. Mr. Ulmans has been held in Latvian custody since his arrest with limited access to the case file and therefore limited ability to challenge the basis for his detention and the charges against him. On December 5, 2022, more than 6-months after he was arrested and incarcerated, Latvian prosecutors charged Mr. Ulmans with inciting an organized group to commit murder. This Application forms a critical part of Mr. Ulmans's efforts to challenge his prolonged, pretrial detention in Latvia and to defend himself at the anticipated trial where he intends to assert his innocence.

## I.     THE LATVIAN CRIMINAL PROCEEDINGS

Mr. Ulmans has asserted his innocence and maintains that he was uninvolved in the killing of Mr. Bunkus.  As described more fully in the Declaration of Janis Zelmenis dated January 26, 2023 (the "Zelmenis Declaration"), the evidence implicating Mr. Ulmans in the murder is thin; by contrast, the universe of potential alternative suspects is quite large.

*First*, the disclosed evidence of Mr. Ulmans's involvement in the Bunkus murder is limited and attenuated.  As alleged by prosecutors, at some undetermined place and time Mr. Ulmans "came to an agreement" with two other suspects, Ex. [2][1] at 1, and met them, again at some undetermined time, in Riga, "close to" and shortly before a meeting between other suspects.  *See id.* at 5.  The allegations with respect to motive are equally thin.  Prosecutors allege only that Mr. Ulmans "had developed a dislike" for Mr. Bunkus in connection with a past business transaction, in which Mr. Bunkus served as the insolvency administrator for a company called Rego Trade, where Mr. Ulmans was a board member.  *See id.* at 1.  Beyond these brief references to Mr. Ulmans, there are no facts alleged that tie him to the murder, despite the presentation of over 7 single-spaced pages of factual details involving other suspects.  *See id.*

*Second*, while the Riga City Court, which presides over the murder investigation, has authorized Mr. Ulmans's continued detention, that authorization is not provided pursuant to an exacting standard.  In a ruling on the subject issued on September 30, 2022, the court merely concluded that the suspect "may have" participated in the Bunkus murder.  *See* Ex. [4] at 3.  The court also noted that in authorizing Mr. Ulmans's detention, it was concerned in part with the potential for interference with the investigation, and it "does not assess the qualification of a criminal offense based on its merits, only as an 'independent observer' the judge comes to the

---

[1] Exhibits cited in this brief are those attached to the Zelmenis Declaration.

belief that a person *could have* committed the punishable offence, that is, the materials of the criminal proceedings contain information that is sufficient to cause '*justified suspicion*.'"   *Id.* (internal citation omitted, emphasis added).  This "justified suspicion" standard is a flexible one that does not require the same exacting probable cause analysis as would be applied to the issuance of a search warrant in the United States, let alone the finding necessary to hold even a charged defendant in federal custody pending trial.  Given the paucity of evidence tying Mr. Ulmans to the case, there is a strong probability that, armed with the right information, Mr. Ulmans will be able to identify alternative suspects and exculpate himself.

## II.    THE REQUESTED TESTIMONIAL AND DOCUMENTARY EVIDENCE

The information sought here is essential to Mr. Ulmans's ability to challenge his continued pretrial detention, and defend himself at his anticipated criminal trial.  Latvian criminal procedural law provides for judicial review of Mr. Ulmans's detention status every two months.  During such review, Mr. Ulmans's criminal defense attorneys will have the opportunity to present arguments and evidence, including evidence obtained in the United States through the current Application, to oppose the prosecution's request for continued detention.  The requests will be tailored to obtain correspondent banking records that could identify or lead to the identification of individuals who had both the motive and means to bring about Mr. Bunkus's murder.  To the extent that Respondents have information that is exculpatory, this proceeding represents Mr. Ulmans's only opportunity to obtain it for his defense.

### A.  Background on correspondent banking

Individuals, organizations, and corporate entities that move funds across international borders generally rely upon the correspondent banking system.  "Correspondent banking" refers to the agreements and relationships between banks to provide payment services for one another.

Knowingly or not, bank customers rely on these services when they direct and receive money transfers involving counterparties in different countries. "Correspondent accounts" are bank accounts held by a bank on behalf of another bank, and such accounts provide part of the infrastructure necessary to facilitate international money transfers.  When an account holder in one country wishes to send funds to a recipient in another country, the sending party's bank will use its correspondent banking relationships to complete the transfer.  The person or company sending the funds is called the originator and the person or company receiving the funds is the beneficiary.  The path from the originator's bank account to the beneficiary's bank account follows a network of correspondent accounts held by global banks.  In the chain, the global banks holding the correspondent accounts are called intermediary banks.  The originator's bank sends the money by directing a series of credits and corresponding debits between correspondent accounts for the ultimate benefit of the beneficiary's bank.

In a simple example, the originator's bank will direct its correspondent bank to debit its correspondent account by a certain sum, and credit the same sum to the correspondent account of the beneficiary bank's correspondent account with the same correspondent bank. The beneficiary bank may then debit its correspondent account and credit the beneficiary's local account.  Even where more correspondent banks are involved, this series of credits and debits makes up the chain of transfers that allows individuals and companies to transfer money to one another across borders and disparate financial systems.

The instructions for these credits and debits are communicated over a universal messaging system hosted by the Society for Worldwide Interbank Financial Telecommunication ("SWIFT"). SWIFT provides a secure communications service used by more than 11,000 banks and securities institutions around the world, and is the primary mechanism for international funds transfers.

When international wire payments are denominated in U.S. dollars, they almost always pass through correspondent accounts maintained at U.S. correspondent banks on behalf of the non-U.S. originating bank.  This is sometimes referred to as "dollar clearing," and the U.S. correspondent banks are sometimes referred to as "clearing banks."  The U.S. correspondent banks that clear international U.S. dollar transactions maintain records of the wire payments passing through their correspondent accounts.  These records are generally maintained in computer systems accessible from their branches and offices in New York County.  The records are searchable, and can be retrieved via a narrow term search of the computer systems for the specific records sought; the records can then be produced in spreadsheet format.

There are a number of sources that can provide information to determine which U.S. banks hold correspondent accounts on behalf of foreign banks.  One source is the websites of the foreign banks themselves.  Foreign banks often list the U.S. banks with which they maintain correspondent relationships.  In addition, there is a consortium of U.S. banks called the Clearinghouse Association that maintains a listing of clearing relationships held by U.S. banks on behalf of international banks.

**B.  Mr. Bunkus likely had enemies with the motive and means to commit murder**

The discovery sought includes correspondent banking records for the victim, Martins Bunkus.  As described in the Zelmenis Declaration, Mr. Bunkus's role as an insolvency administrator likely put him into conflict with many people who were high-level participants in organized criminal activities in the former Soviet states, and who would have had both the means and motivation to seek his murder. Zelmenis Decl. ¶¶ 24-30.  Mr. Bunkus's work as an insolvency administrator, in particular, has provided opportunity to engage in kick-back schemes and extract payments from unhappy creditors.  *Id.* ¶ 24.  He and his family also maintained connections with

a large network of international businesses, which likely afforded them the opportunity to receive and transfer monies from individuals who were drawn into their insolvency work. *Id.* ¶¶ 31-33. Because Mr. Bunkus's work as an insolvency administrator likely resulted in his receipt of monies from individuals who believed they had been wronged by him, it is likely that his correspondent banking records could provide clues as to the true identity of his murderer.

As reflected in the Zelmenis Declaration, *id.* ¶ 34, Mr. Bunkus held accounts with:

    a.  Luminor Bank AS (account ending 4725),

    b.  ABLV Bank AS (account ending 9401),

    c.  Swedbank AS (account ending 4764), and

    d.  Nordea Bank AB (account ending 9473).

These banks maintain correspondent banking relationships with New York banks, including, but not necessarily limited to, Citibank N.A. and Wells Fargo Bank N.A. These and other banks that provide U.S. dollar clearing services maintain a physical presence in Manhattan, and can access their correspondent banking records from their Manhattan offices. Thus, this Application seeks authorization to issue subpoenas *duces tecum* to correspondent banks who may lawfully be subpoenaed in this District seeking records that identify the details of international financial transactions involving Mr. Bunkus's interests.

## LEGAL ARGUMENT

"Congress has long allowed federal courts to assist foreign or international adjudicative bodies in evidence gathering." *ZF Auto. US, Inc. v. Luxshare, Ltd.*, 142 S. Ct. 2078, 2083 (2022). This tradition has been codified at 28 U.S.C. Section 1782, which reads, in pertinent part:

(a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for

use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. . . .

Per this section, a district court is authorized to grant such assistance where (1) the person from whom the discovery is sought resides or is found in the district of the district court to which the application is made, (2) the discovery is for use in a proceeding before a "foreign or international tribunal," and (3) the application is made by the foreign or international tribunal or "any interested person." 28 U.S.C. § 1782(a); *see also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246 (2004).

When an application meets these statutory requirements, courts may exercise their discretion to grant discovery, guided by Section 1782's twin aims of "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Mees v. Buiter*, 793 F.3d 291, 297-98 (2d Cir. 2015) (internal quotations omitted). The Supreme Court has identified four factors to consider in exercising that discretion: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which case "the need for § 1782(a) aid generally is not as apparent"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or burdensome." *Id.* at 298, (quoting *Intel*, 542 U.S. at 264–65).

Courts routinely grant Section 1782 applications on an ex parte basis without prejudicing the rights of the responding parties, because a respondent "can later challenge any discovery request by moving to quash pursuant to Federal Rule of Civil Procedure 45(c)(3)." *Gushlak v.*

*Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) (internal citations omitted).  A district court's determination that a petition satisfies the statutory requirements of Section 1782 is reviewed de novo, and its decision to grant the petition is reviewed for abuse of discretion. *Id.* (internal citation omitted).

     For the reasons described below, Mr. Ulmans's Application satisfies each statutory requirement, the four discretionary factors all support the granting of discovery, and the Court should exercise its discretion to grant the Application.

## I.     MR. ULMANS'S APPLICATION MEETS THE STATUTORY REQUIREMENTS

     The first requirement is satisfied because the Respondents, by definition, through their New York City branches and corporate offices, are "found in" this district.  28 U.S.C. § 1782(a); *see In re Edelman*, 295 F.3d 171, 180 (2d Cir. 2002) (observing that the statute is intended to be construed liberally, and holding that a person is "found" in the district based on mere physical presence).

     The second requirement is satisfied because the requested discovery is for use "in a proceeding" before "a foreign . . . tribunal."  *Id*.  The statute even authorizes discovery for use in "criminal investigations conducted before formal accusation."  *Id.*; *see also In re Wilhelm*, 470 F. Supp. 2d 409, 411 n.1 (S.D.N.Y. 2007) (granting discovery at the request of investigators in the Netherlands); *Akimoto v. Apple Inc.*, No. 22-MC-80056-DMR, 2022 WL 1157496 at *4 (N.D. Cal. Apr. 19, 2022) (granting discovery for criminal defendant in Japanese appellate proceeding). Mr. Ulmans is incarcerated pursuant to an arrest warrant, successive judicial determinations that he should be held, and a formal charging instrument.  His ongoing detention is subject to judicial review in an adversarial proceeding every 2 months.  *See* Zelmenis Decl. ¶ 16.  Mr. Ulmans seeks evidence to present during such a review; thus, this Application satisfies the requirement that the

discovery be intended "for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation."  28 U.S.C. § 1782(a).

Although no trial date has been set, as the Supreme Court held in *Intel*, a matter need not be pending to support an application pursuant to Section 1782; rather, the "for use" requirement is satisfied by a showing that the discovery sought is "to be used at some stage of a foreign proceeding that was within reasonable contemplation" at the time of the Section 1782 petition.  *Mees*, 793 F.3d at 301; *see also Intel*, 542 U.S. at 259.  This generous formulation amply supports discovery here.  Mr. Ulmans is in custody, will have further opportunity to challenge his detention, and has been formally charged.  It is well within reasonable contemplation that the discovery sought will be used "at some stage of a foreign proceeding."  Indeed, he has engaged attorneys in Latvia to represent him in the criminal proceeding.  Section 1782 is designed to support such contemplated criminal proceedings, regardless of the lack of trial date.  *See, e.g.*, *In re Application of Inversiones y Gasolinera Petroleos Valenzuela, S. de R.L.*, No. 08-20378-MC, 2011 WL 181311, at *10, 17 (S.D. Fla. Jan. 19, 2011) (holding the fact that investigation into crimes "has not yet resulted in formal criminal proceedings does not mean that such proceedings are not still within 'reasonable contemplation,'" and ruling that while Section 1782 relief was warranted, the subpoena as drafted was subject to quashing on challenge by the respondents pursuant to Rule 45 of the Federal Rules of Civil Procedure).

Finally, Mr. Ulmans is an "interested person" for purposes of Section 1782.  The statutory term "interested person" encompasses parties and contemplated parties to a foreign litigation.  *See* 28 U.S.C. § 1782 (captioned "Assistance to foreign and international tribunals and to litigants before such tribunals"); *Intel*, 542 U.S. at 256 ("No doubt litigants are included among . . . the 'interested person[s]' who may invoke § 1782."); *cf. Application of Malev Hungarian Airlines*,

964 F.2d 97, 101 (2d Cir. 1992) (noting that the phrase "upon the application of any interested person" was inserted into § 1782 "as part of the effort to liberalize the assistance provided by American courts to foreign and international tribunals").  Mr. Ulmans's immediate liberty is at issue, as is his ability to defend himself at trial.  He therefore meets the third statutory requirement of Section 1782.  *See Akimoto*, 2022 WL 1157496 at *2.

For these reasons, Mr. Ulmans satisfies all three statutory requirements of Section 1782, and the Court should turn to the discretionary factors outlined by the Supreme Court in *Intel*.

## II.   THE APPLICATION SHOULD BE GRANTED IN THE EXERCISE OF THE COURT'S DISCRETION

Granting this Application for judicial assistance in aid of the foreign criminal proceeding before the Riga City Court is an appropriate exercise of this Court's discretion.  Each of the four factors to be considered in exercising discretion under Section 1782 supports this position.  *See Intel*, 542 U.S. at 264-65.  *First*, a favorable exercise of discretion is most warranted where, as here, the respondent from whom discovery is sought is not a party to the foreign proceeding. Whereas a foreign tribunal has jurisdiction over those appearing before it and can itself order them to produce evidence, non-parties "may be outside the foreign tribunal's jurisdictional reach" and "their evidence, available in the United States, may be unobtainable absent § 1782(a) aid."  *Id.* at 264.  This factor militates unequivocally in favor of granting the requested discovery here, because the Respondents are not parties to the Latvian criminal proceeding, nor is the information sought within the jurisdictional reach of the Latvian courts.  Even if a Respondent bank has a branch in Latvia, the U.S. dollar clearing transactions would occur at New York branches, and the records of those transactions are here, and not in Latvia.  Accordingly, to the extent the Respondents have exculpatory evidence, or information that could lead to exculpatory evidence, the current

Application represents Mr. Ulmans's only chance of obtaining that evidence.  This factor alone demonstrates the appropriateness of the requested relief.

*Second*, the Court may consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance."  *Id.*  So long as the record contains no "authoritative declarations" from judicial, executive, or legislative bodies objecting to foreign discovery assistance, this factor generally supports discovery.  *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1101-1102 (2d Cir. 1995) ("Absent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance.")

The Latvian criminal proceeding is an appropriate forum for judicial assistance because it is an adjudicative body seeking to identify and bring to justice those responsible for the murder of Mr. Bunkus.  The requested discovery is intended to help ensure that the Latvian courts get that important question right.  Granting the requested discovery would enhance the integrity and credibility of the Latvian criminal proceeding by assisting in the accumulation of all information that could be relevant to identifying culpable parties and ensuring accountability.

It is also relevant to this Court's consideration of the "character of the proceedings underway abroad," *Intel*, 542 U.S. at 264, that Mr. Ulmans has been in custody since the end of May of 2022, for most of that period without charge.  *See* Zelmenis Decl. ¶ 5; Exs. [5, 6].  This continued pretrial detention limits his ability to prepare a defense, and makes judicial assistance here both necessary and appropriate.  Beyond this, there is no information suggesting that the Latvian court would be hostile to this Court's assistance, and certainly no "authoritative declarations" on the record objecting to foreign assistance.  *Euromepa*, 51 F.3d at 1101-1102.  To

the contrary, as set forth in the Zelmenis Declaration, the evidence obtained through the present Application will be admissible both at further detention review hearings and in the expected criminal trial, subject to ordinary evidentiary and procedural rules.  *See* Zelmenis Decl. ¶ 16. Accordingly, this factor too weighs toward a grant of the Application.  *Euromepa S.A.*, 51 F.3d at 1101; *In re: Ex Parte Application Varian Med. Sys. Int'l AG*, No. 16-MC-80048-MEJ, 2016 WL 1161568, at \*4 (N.D. Cal. Mar. 24, 2016) (quotation and citation omitted) ("In the absence of authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782, courts tend to err on the side of permitting discovery.").

*Third*, the *Intel* Court indicated that a district court may consider "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  542 U.S. at 265.  There is nothing improper about a Latvian criminal defendant pursuing evidence in connection with the criminal proceeding.  *See* Zelmenis Decl. ¶ 16.  As a result, the present Application cannot be viewed as an attempt to circumvent restrictions imposed on Mr. Ulmans in Latvia.  It is true that, at the discretion of the prosecution, Mr. Ulmans has been precluded from viewing some of the evidence within the prosecution's file, as detailed in the Riga Court Decision attached as Exhibit 4 to the Zelmenis Declaration.  However, by definition the exculpatory, third-party information from U.S.-based financial institutions that Mr. Ulmans seeks through the present Application would not be coextensive with any non-disclosed information contained within the Latvian prosecution's file. In short, granting the present Application would not circumvent any restrictions or other policies of either Latvia or the United States.

*Finally*, the fourth factor concerns whether the discovery requests are "unduly intrusive or burdensome."  *Intel*, 542 U.S. at 265.  The requested discovery will be tailored to obtain only the

12

information that could be relevant to Mr. Ulmans's criminal proceeding. It will not seek records of unrelated clients or business transactions; rather, it will call for basic transaction records related to the deceased, which are relatively simple to retrieve by running keyword search terms across a digital transaction database and message repository. Indeed, this is the type of information that compliance departments retrieve on a routine basis in connection with internal investigations, regulatory requests, and law enforcement subpoenas. The requests will be tailored to elicit relevant information without unnecessarily burdening Respondents.

## CONCLUSION

For the foregoing reasons, the statutory and discretionary factors all support the request for discovery, and the Court should grant the Application for Judicial Assistance and authorize Mr. Middlemiss to issue subpoenas *duces tecum* to banks found in this District seeking records that identify the details of international financial transactions involving Mr. Bunkus.

Respectfully submitted,

**LEWIS BAACH KAUFMANN**
**MIDDLEMISS PLLC**

Dated: January 26, 2023

Arthur D. Middlemiss
Solomon B. Shinerock
The Chrysler Building
64th Floor
405 Lexington Avenue
New York, New York 10174
Tel: (212) 822-0165
Fax: (212) 826-7146
Arthur.Middlemiss@lbkmlaw.com
Solomon.Shinerock@lbkmlaw.com