UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE APPLICATION OF MIHAILS
ULMANS FOR JUDICIAL ASSISTANCE
PURSUANT TO 28 U.S.C. § 1782

Case No. 23-cv-

## DECLARATION OF JANIS ZELMENIS IN SUPPORT OF APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

Janis Zelmenis declares under penalty of perjury the following:

**Professional Background and Experience of the Declarant**

1. I am an attorney licensed to practice law in Latvia. I make this declaration in support of the Application of Mr. Mihails Ulmans for Judicial Assistance Pursuant to 28 U.S.C. Section 1782.

2. Unless otherwise noted, the information contained in this declaration is within my personal knowledge, as well as obtained from reliable public sources. In making certain statements below, I rely on my experience as a Latvian attorney familiar with the Latvian legal system.

3. I am a tax and legal advisor with over 20 years of experience providing services to a range of clients in diverse business sectors. I am currently the managing partner at BDO Latvia, the Latvian arm of the international professional services firm, and have held that role since 2007. Between 1998 and 2007 I worked at Deloitte Latvia, and for my last four years there was its managing partner. Between 1995 and 1998 I provided legal and tax consultation at Price Waterhouse Coopers in Latvia. I earned a Masters in International Business Law at the Central European University in 1995, and completed my Bachelor's Degree in law at the Moscow State Institute of International Relations in 1993. As relevant here, I speak Latvian and English, and I am also proficient in Russian, Portuguese and Swedish.

1

**Background and Current Status of Mr. Ulmans**

4. Mr. Ulmans is a 69-year old man who has resided in Riga, the capital of Latvia, since he was born on June 12, 1953. He is a Russian speaking Latvian national, and he is the founder and president of a Latvian company called Mono Holdings, a company that provides financial and custom services, retail, logistics and warehousing solutions.

5. Mr. Ulmans has been held in Latvia since May 24, 2022, and until December 2022 had not been charged, but was held on suspicion of participating in a scheme to murder a Latvian attorney and insolvency administrator named Martins Bunkus. Mr. Bunkus was killed on May 30, 2018.

6. Mr. Ulmans has asserted his innocence and maintains that he was uninvolved in the killing of Mr. Bunkus. As described below, the evidence implicating him in the crime is limited and attenuated.

7. Mr. Ulmans's health condition is suffering from his extended incarceration. According to medical records that I have reviewed, for several years Mr. Ulmans has suffered from health problems, including heart problems, back problems, and other significant issues that require treatment and monitoring.

8. As part of his efforts to challenge his ongoing detention and identify exculpatory evidence in preparation for his anticipated trial, Mr. Ulmans has sought discovery, distinct from that sought here, in the United States District Court for the District of Arizona. His petition in that court, filed on November 23, 2022 pursuant to 28 U.S.C. § 1782, remains pending under docket number 22-mc-52 (GMS).

**The Latvian Legal Proceeding**

9. On or about May 24, 2022, Mr. Ulmans was arrested and held in connection with the murder of Mr. Bunkus pursuant to an investigation identified as Criminal Process No. 11511001018 that is currently pending in the Riga City Court. Since Mr. Ulmans's arrest, his continued detention has been recommended by the State Police and reviewed by a judge of the Riga City Court. A document prepared by the Latvian State Police, labeled "Decision" and dated September 28, 2022 (the "Police Allegations"), sets forth the details of the investigation that have been disclosed to Mr. Ulmans, and conveys the State Police's decision that Mr. Ulmans should remain in custody.

10. A true and correct copy of the Police Allegations is attached hereto as Exhibit [1]. A true and correct copy of an English translation of the Police Allegations is attached hereto as Exhibit [2]. As a dual Latvian and English speaker, I confirm that Exhibit [2] is an accurate and substantial translation of the original Latvian document.

11. A decision of the Riga City Court dated September 30, 2022 (the "Riga City Court Decision"), reflects that court's decision to continue to hold Mr. Ulmans in custody, following a hearing where prosecutors and defense counsel were present. A true and correct copy of the original Riga City Court Decision is attached hereto as Exhibit [3]. A true and correct copy of an English translation of the Riga City Court Decision is attached hereto as Exhibit [4]. As a dual Latvian and English speaker, I confirm that Exhibit [4] is an accurate and substantial translation of the original Latvian court record. A subsequent detention review hearing was held on November 28, 2022, and resulted in Mr. Ulmans's continued detention. No documents from this proceeding have been made available to me, but the issues raised during the proceeding were substantially similar to those raised at the September detention review hearing.

12. On December 5, 2022, Latvian prosecutors formally charged Mr. Ulmans with inciting an organized group to commit murder. A true and correct copy of the charging decision ("Charging Decision") is attached hereto as Exhibit [5]. A true and correct copy of an English translation of the charging decision is attached hereto as Exhibit [6]. As a dual Latvian and English speaker, I confirm that Exhibit [6] is an accurate and substantial translation of the original Latvian document. The Charging Decision largely repeats the information contained in the Police Allegations, and notably adds no additional detail concerning Mr. Ulmans's alleged role in the murder of Mr. Bunkus. The Charging Decision is not the product of a grand jury inquiry or the finding of an impartial judicial authority. Rather, the Charging Decision is an accusation made by the Latvian prosecutors office, pursuant to its own discretion and based on its review of its own file. In this way it bears some similarity to a federal criminal complaint in United States criminal practice.

13. Latvian criminal procedure law permits the detention of a suspect for as long as necessary to ensure the normal progress of proceedings, but not to exceed 24 months for a person suspected of committing an especially serious crime. *See* Latvian Criminal Procedure Law S. 277(7). Of those 24 months, the suspect is permitted to be detained before any charges are filed for up to 15 months. *Id.*

14. Although the existence of "reasonable suspicion" remains a mandatory prerequisite for such pre-charge detention, according to the practice of the European Court of Human Rights, after a certain time, suspicions that a person has committed a criminal offense are no longer sufficient justification, and the state is obliged to provide other "relevant and sufficient" reasons for further detention. *See* European Court of Human Rights, *Urtans v Latvia* (Application No.16858/11), *judgement on 28 October, 2014, para 31.-38.* In *Urtans v. Latvia*, the European

4

Court of Human Rights observed that the pre-trial proceedings involved prolonged detention, yet the national Latvian court continued to refer only to the preliminary suspicion as the sole reason for its continued extension of detention. This was deemed insufficient, and in general, under the jurisprudence of the European Court of Human Rights, these pre-trial detention provisions of Latvian Criminal Procedure are disfavored. *Id; see also* European Court of Human Rights, *Estrikh v. Latvia* (Application no.73819/01), judgement on 18 January 2007.

15. The Latvian proceeding is also marked by the fact that Mr. Ulmans does not have access to the investigative record and, crucially, the evidence being used to justify his continued detention and criminal charge. The case file makes clear that the Latvian prosecution possesses investigative records that it has not disclosed to the defense. Although on September 14, 2022 Mr. Ulmans submitted a complaint related to his lack of access to factual information purportedly justifying his continued detention, that complaint was summarily rejected by the prosecutor's office on September 23, 2022, and not revisited in the Riga City Court Decision. Although this inequality of access is in certain circumstances permitted under Latvian criminal procedure law, it is contrary to Latvia's obligations under the European Convention on Human Rights, which requires that the arrested person have access to the materials that justify the need for detention—rights that are crucial for a person to meaningfully exercise the rights to challenge the legality of detention. As the European Court of Human Rights emphasized in the *Svipsta v. Latvia* case, "in the process where a complaint about the application of detention is considered, it is necessary to ensure the guarantee of equal opportunities for both parties, i.e. the prosecution and the detainee …" European Court of Human Rights, *Svipsta v Latvia* (Application No.66820/01), judgement on 09 March, 2006, para 129(h). In other words, in the view of the European Court of Human Rights,

5

a person cannot adequately rebut the prosecution arguments about the need to apply detention if the person is not informed about the evidence underlying these arguments.

16. Latvian criminal procedural law requires judicial review of Mr. Ulmans's detention status every two months. During the detention review hearings, Mr. Ulmans's criminal defense attorneys have the opportunity to present arguments and evidence to counter the prosecution's request for detention, including evidence obtained in the United States through the current application. There is no categorial prohibition on either the gathering or the presentation of external evidence during the detention review process. The same is true for any anticipated criminal trial. Thus, the information sought through the current application would be considered properly obtained and received directly by the Latvian courts, subject to normal Latvian evidentiary and procedural rules. Similarly, any information identified through the current application and subsequently obtained from third parties would be properly presented for admission in the Latvian courts.

**The Paucity of Evidence in the Latvian Murder Investigation**

17. Mr. Bunkus was shot in Riga, Latvia on May 30, 2018. Despite the arrest of Mr. Ulmans and multiple other individuals as suspects nearly 4 years later on or about May 24, 2022, no charges were brought until December 5, 2022. According to the Police Allegations, Mr. Ulmans was the person, or one of the persons, who directed and paid for the murder. A second individual named Alexander Babenko, a former business associate of Mr. Ulmans, is posited as the "money handler" and the connection to a third suspect who functioned as an "organizer." In addition to these three, the State Police suspect a "shooter," a "driver," and the "supplier" of vehicles and weapons used in the murder. In or around the end of May 2022, Latvian authorities arrested, in addition to Mr. Ulmans, Mr. Babenko, the weapons and vehicles supplier, and the

6

shooter. The organizer was murdered in the period since 2018, and the whereabouts of the driver are unknown.

18. The Police Allegations, like the Charging Decision, include multiple pages of details concerning the precise preparations for the murder, including the movements of the organizer, shooter, driver, and supplier of vehicles and weapons, their preparatory research to determine Mr. Bunkus's commuting routines, how the necessary vehicles and weapons were obtained, and the specifics of an initial attempt on September 27, 2016 and the ultimate murder on May 30, 2018. *See* Exhibit [2] at 2-7. In all this, there is almost no detail as to Mr. Ulmans's participation.

19. The disclosed evidence of Mr. Ulmans's involvement in the Bunkus murder is limited and attenuated. As alleged in the Police Allegations, at some undetermined place and time Mr. Ulmans "came to an agreement" with Mr. Babenko and the organizer, Ex. [2] at 1, and met them, again at some undetermined time, in Riga, "close to" and shortly before the organizer met with the shooter. *See id.* at 5. The time and place of the meeting between the organizer and shooter were undisclosed. *See id.* Under the alleged agreement, the organizer and the shooter would receive collectively 300,000 Euros to murder Mr. Bunkus. *Id.* at 1.

20. The Police Allegations with respect to motive are equally thin, specifying only that Mr. Ulmans "had developed a dislike" for Mr. Bunkus in connection with a past business transaction, in which Mr. Bunkus served as the insolvency administrator for a company called Rego Trade, where Mr. Ulmans was a board member. *See* Ex. [2] at 1.

21. Beyond these brief references to Mr. Ulmans, the Police Allegations lack any facts tying him to the murder. The Police Allegations point to no other motive or factual connection between Mr. Ulmans and Mr. Bunkus, and contain no other reference to Mr. Ulmans's

7

involvement in the crime, despite the presentation of over 7 single-spaced pages of factual details. As noted above, the Charging Decision tracks, nearly word for word, the Police Allegations, and adds no additional information on the alleged role of Mr. Ulmans in the murder.

22. The Riga City Court Decision reaffirming that Mr. Ulmans be detained indicates that the judge was able to review case materials that have not been disclosed to the defense. *See* Ex. [4] at 3. Although it does not say that such materials specifically implicated Mr. Ulmans, the court concludes on the basis of those materials that the suspect "may have" participated in the Bunkus murder. *Id.* The court also notes that, in continuing Mr. Ulmans's detention, it was concerned in part with the potential for interference of the investigation, and it "does not assess the qualification of a criminal offense based on its merits, only as an 'independent observer' the judge comes to the belief that a person *could have* committed the punishable offence, that is, the materials of the criminal proceedings contain information that is sufficient to cause '*justified suspicion.*'" *Id.* (internal citation omitted, emphasis added). Based on my knowledge of the Latvian criminal justice system, this is a flexible standard that does not require the same exacting probable cause analysis as would be applied to the issuance of a search warrant in the United States, and requires significantly less factual support than the finding necessary to hold a charged defendant in federal custody pending trial.

**The Requested Discovery is Likely to Generate Exculpatory Evidence and Leads**

23. Mr. Ulmans needs the requested discovery to support his ongoing detention review and in anticipation of an eventual trial where Mr. Ulmans intends to challenge the prosecution's theory that he was involved in the Bunkus murder. The discovery requested will seek records of international financial transactions involving Mr. Bunkus that are held by correspondent banking institutions with branch offices or headquarters in New York. Given Mr. Bunkus's business

8

activities, as set forth below, the requested discovery is calculated to lead to the discovery of exculpatory information, including potentially alternative suspects.

24. In particular, Mr. Ulmans is following specific leads that may assist him in identifying exculpatory evidence located in the U.S. Mr. Bunkus's work put him in a position to make many enemies of powerful, well-financed individuals. As an insolvency administrator, Mr. Bunkus's role was to oversee the dissolution of bankrupt businesses, including financial institutions in Latvia. This is a lucrative role, and one which conferred significant discretion on Mr. Bunkus to allocate assets amongst creditors and accountholders at the liquidating entities. The role provides opportunity for corruption, as the administrator not only commands significant commissions and fees from the liquidating entity, but is also positioned to demand enormous bribes and kickbacks from creditors and accountholder in exchange for favorable disposition of assets. Mr. Bunkus has not been proven to have taken advantage of any such opportunity, though related allegations have been made in the press.

25. Mr. Bunkus had come to the attention of the Latvian media in connection with such conduct as early as 2016, when local media began to publish a series of articles about his wealth, alleging that he and one of his brothers, Kaspars, a senior figure at the Latvian State Revenue Service (SRS)—an analog to the U.S. Internal Revenue Service—engaged in illegal conduct for their own benefit as part of their insolvency work.

26. As one example, in or around 2017, Mr. Bunkus served as part of the insolvency administration team for a Latvian bank called Trasta Komercbanka, and in that role he may have come into conflict with multiple dangerous individuals located in the Commonwealth of Independent States, a multi-jurisdictional organization that promotes cooperation between constituent republics of the former Soviet Union. The European Central Bank had revoked Trasta

9

Komercbanka's banking license in 2016. The bank was widely suspected of holding funds on behalf of Russian oligarchs and other individuals involved in fraud, extortion, and illicit business activities throughout the region of former states of the Soviet Union. Many of the bank's funds were believed to be proceeds of illegal activity and were part of money laundering activities by Russian organized crime. This was in part the reason that Trasta Komercbanka's license was revoked, leading to its insolvency proceeding.

27. I have been informed that, in view of various public sources, including direct interviews of a deputy of the parliament of the Republic of Latvia, there is sufficient information in the public record to suggest that Mr. Bunkus may have demanded significant kickbacks from multiple Trasta Komercbanka accountholders as a prerequisite to his releasing accountholder funds. Many of these accountholders were alleged to have maintained deep connections to criminal networks in the region.

28. At the time that Bunkus served as part of the insolvency administration team for Trasta Komercbanka, his income increased by over 700%, from approximately €190,000 in 2016 to approximately €1,484,000 in 2017. These figures come from the public income declarations that Mr. Bunkus filed himself, as required for all insolvency administrators. This considerable income increase lends credence to the public sources who reported that Mr. Bunkus sought and received extortion payments and kickbacks from Trasta Komercbanka accountholders who were desperate to have their funds returned.

29. Members of organized crime networks in former Soviet states and the Baltics who felt extorted by Mr. Bunkus's alleged tactics during the Trasta Komercbanka insolvency process are obvious suspects in Mr. Bunkus's eventual murder.

30. More generally, I have identified 53 companies in Latvia linked to Mr. Bunkus. He was an administrator at more than 45 companies in the country between 2010 and his death in 2018. These figures underscore that he may have been involved in multiple other controversies that were never reported on either before after his death. The number of insolvency engagements is also striking because of the reporting in 2016 and 2018, noted above, alleging that he and his brother Kaspars worked together to extract illicit payments from the owners of companies in liquidation. Notably, while he was only listed as an administrator of Rego Trade when he died, in the months preceding his death (and going back to 2017), he was an administrator at eight other companies. Research into some of these Latvian companies reveals certain irregularities, including reports that he failed to provide proper notice to certain creditors about the decision to sell property or extend the bankruptcy procedure. Research also shows that Mr. Bunkus was the administrator of companies with potential ties to Russian organized crime and, separately, prominent political figures.

31. Mr. Bunkus's business affairs, including those linked to his family, included regular international financial transactions. During the period of 2016 – 2018 discussed above, Mr. Bunkus and his family members appear to have maintained executive roles and a beneficial ownership interest in multiple "off-shore" shell companies, i.e., the same kind of corporate vehicle it was alleged that Trasta Komercbanka customers, and customers of other Latvian banks, used to hide and launder criminal proceeds. Mr. Bunkus's use of such off-shore vehicles have been reported publicly. For example, Mr. Bunkus's father, OJars Bunkus, is linked to a UK partnership, Kentprom Management LLP (he signed off on corporate reporting to members in 2017), that owned, via a 100%-owned Latvian company called SIA Kentprom Investment, an upscale residence in Riga, according to company filings and the land registry. Latvian media reported that

Mr. Bunkus used this house as a residence but did not report the house on the asset declaration forms he filed as a public official. At the same time, Mr. Bunkus's mother has links to a separate UK partnership, Spritwell Commerce LLP. Both UK partnerships share the same two Belize companies as owners (Livorna Holdings S.A. and Verona Inter S.A.). Latvian media has also reported on these links.

32. As a further example, Ojars Bunkus is also the sole director of a Cypriot entity called Horezalla Holdings Limited, a company that is wholly owned by a nominee shareholder with links to criminal gambling operations run from Montenegro in 2015, and Czech companies tied to drug traffickers in 2016. The ownership structure was also the beneficiary of the distressed sale of a Russian vodka distillery called Liviz in 2019. The elder Mr. Bunkus is also the liquidator of a Latvian company called Sun Garden SIA that received proceeds from the unauthorized sale to a Russian-owned Belize company of a distressed soccer stadium in Latvia. The stadium had been under the management of a state-owned firm established to recover assets of a Latvian Bank.

33. Likewise, at the time of his death, it was reported that Mr. Bunkus was seeking to be the administrator for another bank, ABLV Bank, which closed after being targeted by a U.S. action pursuant to section 311 of the USA PATRIOT Act. As explained in my declaration in support of Mr. Ulmans's section 1782 petition filed in the United States District Court for the District of Arizona, just before his death, Mr. Bunkus had reportedly retained the services of a United States-based lobbyist named David Merkel to assist him in acquiring the administrator role for ABLV bank.

34. Consistent with this level of business activity, Mr. Bunkus held accounts with numerous banks, including:

   a. Luminor Bank AS (account ending 4725)

   b. ABLV Bank AS (account ending 9401)

   c. Swedbank AS (account ending 4764), and

   d. Nordea Bank AB (account ending 9473).

35. When transferring U.S. dollar denominated payments overseas using these bank accounts, Mr. Bunkus, knowingly or not, would have relied upon a series of correspondent banking relationships by which his bank would initiate a series of credits and debits that would cause the transfer of funds between his account and the accounts of his counterparties. Each of these transfers would be recorded in the transaction records of any correspondent banks located New York City, and such records are the target of the requested discovery.

36. The requested discovery is expected to identify individuals who sent money to Mr. Bunkus, as well as the timing and amounts of their payments. This is relevant because such individuals may be alternative suspects, given Mr. Bunkus's role in the alleged kick-back scheme. In addition, the timing and amount of given payments may be matched up to other transactions to build a complete picture of Mr. Bunkus's business activity, in particular business activity that involved overseas payments. This is valuable because moving money overseas is often a diversionary tactic, and could reflect that the payments in question were received as part of the widely-reported kickback scheme, and Mr. Bunkus was attempting to hide them from authorities or other creditors. In general, the records will provide details of Mr. Bunkus's off-shore financial operations and the identities of parties that may have conducted business with Mr. Bunkus in the relevant time period, which in turn may provide alternative suspects in his murder.

37. I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 26, 2023

_____
Janis Zelmenis